# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6533 | **DATE** | 9/16/2003 |
| **CASE TITLE** | DELORIS EARNEST vs. SHRINERS HOSPITALS FOR CHILDREN | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Shriners' motion for summary judgment is denied in part and granted in part. Summary judgment is denied as to Count I and granted as to Count II.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 18 2003 | |
| | Notified counsel by telephone. | | date docketed | 23 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | CLERK | | |
| | | 03 SEP 17 PM 4:12 | date mailed notice | |
| LG | courtroom deputy's initials | FILED FOR DOCKETING | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

**DOCKETED**

SEP 1 8 2003

| | |
|---|---|
| DELORIS EARNEST, | ) |
| Plaintiff, | ) |
| v. | ) No. 02 C 6533 |
| SHRINERS HOSPITALS FOR CHILDREN, | ) Judge John W. Darrah |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Deloris Earnest, filed a two-count complaint against Defendant, Shriners Hospitals for Children, alleging age discrimination and a state claim of retaliatory discharge. Presently before the Court is Shriners' Motion for Summary Judgment.

## BACKGROUND

Shriners is a network of twenty-two pediatric speciality hospitals located throughout North America, including a hospital in Chicago, where children receive medical care free of charge. (Def.'s 56.1(a)(3) Statement ¶ 10). Shriners hired Earnest as a nursing assistant at its Chicago hospital in August 1981. (Id., ¶ 11).

Beginning in 1999, other nurse assistants made comments about Earnest's age, including asking when she was going to retire and telling her it was time for the younger generation to take over. Beginning in 2000, younger nursing assistants referred to the employees who worked Earnest's shift as "old age people". (Def.'s 56.1(a)(3) Statement ¶ 12; Plaint.'s Response to ¶ 12). The six nursing assistants Earnest identified as making such comments were not assigned to the unit where Earnest worked during the night shift. However, two of the nursing assistants that made such



comments occasionally worked in Earnest's unit if their unit was not busy. In addition, Earnest sometimes encountered the nursing assistants when she arrived fifteen minutes before her shift or at the end of her shift. (Id., ¶ 13). Beginning in 2000, Michaleen LaCivitia, one of Earnest's supervisors, made comments on several occasions that the younger nursing assistants "would put [Earnest] to shame" and had more strength than Plaintiff to work with the adolescent patients. (Plaint's 56.1(b)(3) Statement ¶ 66). Earnest did not complain in any fashion at any time about the comments made by the nursing assistants. (Def.'s 56.1(a)(3) Statement ¶ 14).

Throughout her employment at Shriners, Earnest received merit increases and positive performance evaluations from all her supervisors. (Def.'s 56.1(a)(3) Statement ¶ 15). Earnest's last two annual evaluations had the higher ratings than Earnest had received previously. (Id., ¶ 16). In May 2002, Earnest was nominated for the Outstanding Nursing Assistant Award. Earnest finished second in the voting for this award, the highest she had ever received for this award. (Id., ¶ 26).

On May 5, 2002, Earnest was present when Beata Lostumbo, another nursing assistant, asked Marilyn Ruszkowski, a nurse at Shriners, about changing the dressing on a patient's wound. (Def.'s 56.1(a)(3) Statement ¶ 17). Earnest asked Ruszkowski why Lostumbo was changing dressings while Earnest was not; Ruszkowski replied, "Maybe [Lostumbo] was trained to do them." (Id., ¶ 18). Earnest asked Ruszkowski why Earnest had not been trained to do dressing changes and told Ruszkowski that Lostumbo "ha[d] to have a degree in order to do this at Shriners Hospital." (Id., ¶ 19). Earnest did not mention Illinois law during her conversation with Ruszkowski, and she is unaware of any provision of Illinois law that makes it illegal for nursing assistants to change dressings. (Id., ¶ 20). Earnest believed that Lostumbo was disciplined for her conduct through a conversation she had with LaCivitia. (Id., ¶ 23). Earnest was not disciplined for reporting or

observing any of Lostumbo's conduct. (Id., ¶ 24). Neither James Pawlowicz, Shriners' Human Resources Director, nor Shirley Bradley, Shriners' Human Resources Specialist, were aware of any complaint by Earnest about Lostumbo's performance of duties beyond her scope of a nursing assistant. Neither were aware of the discipline that Lostumbo received for performing duties outside her position. (Id., ¶ 25). Following the May 5th incident, Earnest was labeled "a mole" by Lostumbo and another registered nurse. (Plaint.'s 56.1(b)(3) Statement ¶ 72).

On June 27, 2002, Earnest attended one of several meetings Pawlowicz conducted for all Chicago Shriners' employees to discuss a new employee handbook. (Def.'s 56.1(a)(3) Statement ¶ 27). Prior to this meeting, Earnest had two face-to-face conversations with Pawlowicz. The first meeting was a brief introduction when Pawlowicz first started at Shrines. The second conversation concerned questions Earnest had about benefits. (Id., ¶ 28). Pawlowicz does not recall either conversation. (Id., ¶ 29). Shriners employs approximately 335 employees at the Chicago Hospital, and Pawlowicz knows approximately one-third of the Chicago employees by name. (Id., ¶¶ 30-31). Earnest was not one of the employees Pawlowicz knew by name during her employment at Shriners. (Id., ¶ 32). Pawlowicz works primarily during the day and has limited contact with employees, such as Earnest, who work the night shift. (Id., ¶ 33).

At the Handbook Meeting, which Earnest attended with approximately fifteen other employees, Pawlowicz discussed Shriners' policy of employment at will. (Def.'s 561.(a)(3) Statement ¶ 34). Pawlowicz testified that he directed his comments about employment termination to everyone in the room. Earnest, who was seated right in front of Pawlowicz, believed that some of Pawlowicz's comments referred only to her. (Id., ¶ 35).

Earnest testified that Pawlowicz directed his comments to her. These comments included

3

looking around the room and stating, "I know what's on everyone's mind". He then looked directly at Earnest and asked, "Why is she still here?". Pawlowicz continued looking straight at Earnest with a malicious look on his face. Pawlowicz said that Earnest was a "bad seed" that he would "weed out" and "get rid of" her. He stated that with the new handbook he could "get rid" of Earnest without giving a reason or cause and that he would "weed [Earnest] out and get rid of [her] soon, yet and soon." He repeated the same thing over and over for about fifteen minutes. He also stated, "What you've done to this hospital." (Id., ¶ 36; Earnest's Dep. pp. 61-64).

Bradley was present at the same meeting as Earnest. Bradley recalls Pawlowicz's using the words "getting rid of" in connection with his discussion of at-will employment. She also recalls that Pawlowicz may have referenced a "bad seed" when discussing disciplinary actions. Bradley did not believe that any comments were directed at a specific employee, including Earnest. (Plaint.'s 56.1(b)(3) Statement ¶ 82; Def.'s Response ¶ 82). Pawlowicz denies that he used the words "get rid of" and "bad seed". (Plaint.'s 56.1(b)(3) Statement ¶ 83).

Based on the events of the Handbook Meeting, Earnest decided to retire because she believed that she was going to be fired. Earnest did not want to be "escorted out" of the hospital. (Id., ¶ 38, Earnest's Dep. pp. 70-71). Prior to the Handbook Meeting, Earnest never had expressed any intention of retiring. (Id., ¶ 39). Earnest's only reason for retiring was due to her age and for reporting Lostumbo's misconduct, as Earnest believes was conveyed in Pawlowicz's comments at the Handbook meeting. (Plaint.'s 56.1(b)(3) Statement ¶ 94).

Earnest worked the night shift of Thursday, June 27, 2002, her first scheduled shift after the Handbook Meeting. She also worked her shift on June 29, 2002. (Def.'s 56.1(a)(3) Statement ¶ 40). Earnest was scheduled to work on June 30, 2002; but she called in sick. (Id., ¶ 41).

4

On July 1, 2002, Earnest telephoned Bradley to inquire about retirement. Earnest described the conversation as follows:

> I telephoned her between 8:00 and 9:00 on July 1, 2002, and I said to her that I would like to proceed – to find out the process in proceeding with retirement because I felt like I was being forced to retire, and her next words were, is anything wrong? I didn't answer that for the simple reason I told her I was forced to retire and she was at the handbook meeting.

(Def.'s 56.1(a)(3) Statement ¶ 42). Bradley, who believed that Earnest telephoned on June 28, 2002, described this same telephone conversation as follows:

> I received a phone call from Deloris Earnest. At first, I thought she was requesting for an estimate of her retirement benefits and then she clarified it and she stated that she wanted me to process her retirement.
>
> * * *
>
> [S]he ... stated to me that she was going to be working on Saturday the 29th, but that was going to be her last day that she worked.
>
> * * *
>
> During the course of the conversation when she clarified that she wanted me to process her retirement, I told her that usually the employees let me know like four or five months in advance that they're going to retire so they can sort of like get an estimate of what their monthly amount would be and is that what she wanted me to do. She reiterated that no, she was retiring and that would I process it, and at that time I told her well, in order for me to process her retirement then I would need something from her in writing regarding that when her last day would be and I could go ahead and process her retirement. So at that time, she told me that she would come in on Monday because she had to wait for her daughter and that she would bring it in then.
>
> * * *
>
> I thought maybe something had happened and I was rather concerned because it was a very odd request. In the 14 years, almost 14 years, that I had worked at Shriners, I had never had a retirement like that so it was very awkward to me for her to, you know, just do it like that. You know, I was glad that she was coming up on Monday because I thought maybe she and I could sort of talk because I thought we had a good rapport with one another.
>
> * * *

5

> Well, her voice sort of, you know, was breaking, and I felt at that time I wouldn't pursue it because I knew she was going to come in on Monday because I told her – I said, you know, if there's something going on at – I was trying to be very empathetic and sympathetic because I didn't understand what was going on so I was a little confused of why she was just retiring on the spot. She said that she just wanted me to process her retirement....

(Id., ¶¶-44). Bradley also recalls asking Earnest if anything was going on or if anything happened; Earnest didn't answer – "she wouldn't say." (Id., ¶ 43). Based on Earnest's comments during the telephone conversation, Bradley understood that Earnest's last day of work would be June 29, 2002, and that she wanted her retirement date to be July 1, 2002. (Id., ¶ 45).

On July 1, 2002, Earnest handed Bradley a letter that stated: As of July 1, 2002, I, Deloris Earnest, am requesting that my retirement come into effect." (Def.'s 56.1(a)(3) Statement ¶ 47). Bradley recalls telling Earnest twice at the July 1st meeting that she did not have to retire and that Earnest could take a leave of absence if something had happened that Earnest did not want to discuss. (Id., ¶¶ 48-49). Earnest's daughter, Tiffany, who was also at the July 1st meeting, does not recall Bradley making these statements. (Tiffany's Dep. pp. 23-28). Bradley also asked Earnest to do an exit interview, but Earnest refused to do so. (Def.'s 56.1(a)(3) Statement ¶ 50).

On July 1, 2002, Bradley told Mary Kneip, a Shriners's employee who prepared the nursing assistants' work schedule, that Earnest was bringing in a letter stating that she was retiring. Kneip noticed that Earnest was scheduled to work that night so she made arrangements for the shift to be covered. Kneip put a line through Earnest's name on the printed schedule for July 1, 2002. (Def.'s 56.1(a)(3) Statement ¶ 53).

During her employment, Earnest never complained to Shriners in any fashion at any time about the comments allegedly made by Pawlowicz at the Handbook Meeting. Earnest was aware

that Shriners had established a grievance procedure and discrimination complaint resolution process to address complaints about coworker's conduct. (Id., ¶ 54).

Earnest believes that Pawlowicz and Bradley decided to terminate Earnest's employment. (Def.'s 56.1(a)(3) Statement ¶ 57). Neither Pawlowicz or Bradley had supervisory authority over Earnest, and neither had the authority to terminate Earnest's employment. (Id., ¶¶ 58-59). Earnest's belief that Pawlowicz wanted to terminate her employment is based entirely on her perception of his comments at the Handbook Meeting, which, she admits, did not include any comments about her age. (Id., ¶ 61). Earnest does not believe that Bradley was biased against her because of her age. (Id., ¶ 62).

Following Earnest's retirement, Lostumbo worked extra hours to cover Earnest's shift. In November 2002, Shriners hired Stefania Hudesku as an additional nursing assistant. Hudesku is 36 years old. (Plaint.'s 56.1(b)(3) Statement ¶ 97).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Age Discrimination in Employment Act (ADEA) makes it unlawful to "discharge any

individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). A plaintiff may prove discrimination through either direct or circumstantial evidence or the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (*Jackson*). Direct evidence is defined as "evidence, 'which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Plair v. E.J. Brach & Sons*, 105 F.3d 343, 347 (7th Cir. 1997) (citation omitted). In an employment discrimination case, direct evidence must speak directly to the issue of discriminatory intent; and it must relate to the specific employment decision in question. *Cowen v. Glenbrook Security Serv., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). Plaintiff has not presented any direct evidence of discrimination; thus, the focus is on the *McDonnell Douglas* burden-shifting method. *See Credo v. Zema Systems Corp.*, 944 F. Supp. 677, 682 (N.D. Ill. 1996) (Title VII and ADEA claims are analyzed according to *McDonnell Douglas*).

Under the *McDonnell Douglas* burden-shifting test, the plaintiff must first establish a *prima facie* case by the preponderance of the evidence. *Jackson*, 176 F.3d at 982. The plaintiff must show that her age was a determining factor in the employer's decision. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998). The plaintiff must establish that: (1) she was in a protected class (40 years of age or older (29 U.S.C. § 631(a)); (2) she performed her job duties such that she was meeting her employer's legitimate expectations; (3) despite her performance, she suffered an adverse employment action; and (4) similarly situated younger employees were treated more favorably. *See Bennington v. Caterpillar Inc.* 275 F.3d 654, 659 (7th Cir. 2001) (*Bennington*).

In the instant case, Plaintiff has established that she is in a protected class and that she was

8

meeting her employer's legitimate expectations and that she was discharged.

Plaintiff alleges that the adverse employment action was her forced retirement, which constitutes a constructive discharge.

To establish a constructive discharge, a plaintiff must show that her "working conditions were so intolerable that a reasonable person would have been compelled to resign." *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999). The plaintiff must also show that the intolerable working conditions were because of impermissible age discrimination. *Bennington*, 275 F.3d at 660.

To constitute intolerable working conditions, the conditions must be even more egregious than that of the high standard for hostile work environment because in the "ordinary case, an employee is expected to remain at work while seeking redress." *See Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000). Intolerable working conditions have been found in such environments where an employee was subjected to escalating sexual remarks culminating in a physical assault and death threat, *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir. 1989); where a manager held a gun to the employee's temple, took a picture and then circulated the picture at a company meeting, stating that "this is what a nigger looks like with a gun to his head", *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1191, 1199 (7th Cir. 1992); and where an employee's disputed sexual relationship with her supervisor resulted in a suicide attempt, *Snider v. Consolidated Coal Co.*, 973 F.2d 555, 557, 561 (7th Cir. 1992).

On the other hand, working environments that do not constitute an intolerable working condition include: an employee that was shunned, received harassing phone calls, discovered that someone had gone through their papers in their work locker, and who was told once that his safety

might be in jeopardy, *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886-87 (7th Cir. 1998); an employee that had a series of work restrictions placed on him, the denial of flex-time requests, a bar on speaking to coworkers about non-work related matters, and shortened breaks, *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996); and an employee that received an arbitrary reprimand, was excluded from office activities, assigned to a fallow sales territory, and received lack of supervisor support, *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir. 1993).

In the instant case, when reviewing all of the evidence and the reasonable inferences that may be drawn from the evidence in the light most favorable to Earnest, a genuine issue of material fact exists as to whether Earnest's working conditions were so intolerable that a reasonable person would have been compelled to resign. The "adverse" working conditions, including a number of comments made by coworkers that related to Earnest's age and the alleged comments by Pawlowicz at the June 27th Handbook Meeting, present a genuine issue of whether her working conditions were so intolerable that a reasonable person would have been compelled to resign.

Earnest also contends that Pawlowicz's comments at the Handbook Meeting communicated to Earnest that she would be terminated and, as such, constituted a constructive discharge.

A constructive discharge can also be shown by demonstrating that the employer acts in a manner so as to communicate to a reasonable employee that she will be terminated, and the employee resigns. *See Equal Employment Opportunity Comm'n v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002) (*EEOC*). For example, in *EEOC*, the court found that the employee was constructively discharged after the employee's evaluations became significantly changed when a new supervisor arrived; the employee was repeatedly accused of failing to follow directives; the new supervisor was hostile to the employee's religious beliefs; a supervisor told the

10

employee that the failure to remember something was "the last straw"; and, when the employee arrived at work, her belongings were packed and her office was being used for storage. *EEOC*, 276 F.3d at 332.

Here, Pawlowicz's comments that Earnest believes were directed at her at the Handbook Meeting demonstrate a genuine issue of material fact as to whether Shriners acted in a manner so as to communicate to Earnest that she would be terminated.

Furthermore, "a constructive discharge claim requires evidence that quitting was the only way the plaintiff could extricate herself from the intolerable conditions." *Sweeney v. West*, 149 F.3d 550, 558 (7th Cir. 1998). Here, the individual that made the comments to Earnest, Pawlowicz, was also the individual that Earnest would speak to concerning any alleged discriminatory conduct at work. Accordingly, a genuine issue of material fact exists as to whether quitting was the only way that Earnest could remove herself from the alleged intolerable working conditions.

To establish a *prima facie* case of retaliatory discharge under Illinois law, a plaintiff must show that she was (1) discharged, (2) in retaliation for her activities, and (3) that the discharge violates a clear mandate of public policy. *See Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill. 2d 526, 529 (1988) (*Hinthorn*). Furthermore, while Illinois does not recognize a claim for "constructive retaliatory discharge", see *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 152 (1999), an employee may be determined to have been discharged even though the words "you're fired" have not been spoken, *see Hinthorn*, 119 Ill. 2d at 912. "So long as the employer's message that the employee has been involuntarily terminated is clearly and unequivocally communicated to the employee, there has been an actual discharge, regardless of the form such discharge takes." *Hinthorn*, 119 Ill. 2d at 912.

11

For example, in *Hinthorn*, the court found that an employee was discharged where she signed a voluntary resignation form. However, in that case, the employer told the employee that she should seek other employment, informed the employee that she had too many injuries, had the employee sign a "voluntary resignation" form, and told the employee that, by signing the resignation form, she would be able to leave her employment under her own free will. *See Hinthorn*, 119 Ill. 2d at 910.

Earnest concedes that Illinois does not recognize a claim for constructive retaliatory discharge. Earnest argues that her forced retirement should be construed as a discharge. As discussed above, a genuine issue of material fact exists as to whether Pawlowicz's comments at the Handbook Meeting constitute a clear and unequivocal communication that Earnest was involuntarily terminated.

However, Earnest has failed to show that her "discharge" was in retaliation for her activities of informing a supervisor about a coworker's performance of duties beyond the scope of her work. Earnest testified that Pawlowicz and Bradley made the decision to terminate her employment. However, neither Pawlowicz nor Bradley knew about Earnest's informing a supervisor about the co-worker's performance of duties beyond the scope of her work; and neither had the authority to terminate Earnest's employment.

## CONCLUSION

For the reasons stated above, Shriners' Motion for Summary Judgment is denied in part and granted in part. Summary judgment is denied as to Count I and granted as to Count II.

Dated: 9-16-03

JOHN W. DARRAH
United States District Judge

12